STATE OF IOWA, Appellee, v. JOE WILLIAMS, Appellant.

WITNESSES: Examination—Inducing Change in Testimony. The re-
fusal of the court in a criminal case to allow counsel to lead his
own witness into a repudiation or change of part of the witness's
testimony will not be disturbed, in the absence of a showing of
gross abuse.     .

CRIMINAL LAW: Other Offenses—Waiver of Error. Error may not
be predicated on the reception of testimony tending to show the
conviction of the accused of various crimes other than that for
which he was on trial, when complainant neither objected to the
questions nor moved in the trial court to strike the answers.

CRIMINAL LAW: Appeal—Review—Incompetent Testimony. Error
may not be based on a statement by a witness to the effect that
he "believed the defendant to be guilty," when the State did not
call for such opinion, and when the defendant made no effort to
clear the record of such objectionable statement.

CRIMINAL LAW: Trial—Presence of Accused—Presumption. The de-
fendant's presence during all stages of the trial will be presumed,
in the absence of a contrary showing.

EVIDENCE: Documentary Evidence—Photographs of Body. Photo-
graphs are admissible on the issue as to the manner in which a
crime was committed, the motive therefor, the identity of the de-
ceased, and the environment of the crime when committed.

EVIDENCE: Demonstrative Evidence—Articles at Scene of Homicide.
Articles found at the scene of a homicide may be admissible even
though they are not shown to have been in the possession of the
accused.

EVIDENCE: Relevancy—Movements of Accused. The State, on the
trial of an indictment for criminal homicide, may very properly
trace the movements of the accused at a time prior and subsequent
to the homicide.

CRIMINAL LAW: Alibi—Instructions. Instructions as to alibi re-
viewed, and held to present no error.                       .

CRIMINAL LAW: Evidence—Self-Serving Declarations of Inno-
cence. When, under an indictment for criminal homicide, the ac-
cused defended on the ground that another party was the guilty
person, and introduced testimony tending to establish such defense,
it is reversible error to receive in evidence the self-serving dec-

larations of innocence *by such other party.* So held where such other party was permitted to detail a "third-degree" transaction to the effect that he was taken by the sheriff to the scene of the crime, and threatened with immediate death if he did not confess his guilt, and that then and there he (said other party), through a recited prayer, called upon God to witness his innocence.

PRESTON, C. J., ARTHUR and DE GRAFF, JJ., dissent.

*Appeal from Polk District Court.*—LESTER L. THOMPSON, Judge.

APRIL 3, 1923.

DEFENDANT was indicted for murder in the first degree. He entered a plea of not guilty. On the trial to a jury, he was found guilty of the crime, as charged, and the verdict fixed the death penalty. Judgment was entered, in conformity to the verdict. Defendant appeals.—*Reversed.*

*George H. Woodson, Charles P. Howard,* and *McHenry & Bowers,* for appellant.

*Ben J. Gibson,* Attorney-general, *John Fletcher,* Assistant Attorney-general, *Arthur G. Rippey,* County Attorney, and *T. J. Guthrie,* for appellee.

FAVILLE, J.—Appellant was indicted and convicted of murder in the first degree, and sentenced to be hanged. Sara Barbara Thorsdale, with whose murder the defendant is charged, was twenty-four years of age at the time of her death, which occurred June 2, 1921. She was a teacher in the public schools in the city of Des Moines, and at the time in question was employed in the Clara Barton school, which building is located in the extreme southwestern part of the city, on Fifty-sixth Street, some distance south of what is known as Park Avenue. Miss Thorsdale resided at 4814 University Avenue, Des Moines. On the morning of each school day she took a street car from her residence to the Union Depot, and thence a train to a crossing stop located at the intersection of the railroad and Park Avenue, a little to the east of the Hawkeye Portland Cement Company's plant. From this point her usual route of travel was

west on Park Avenue to Fifty-sixth Street, and thence south on Fifty-sixth Street to the school building. Sometimes she took a shorter route, following a switch track which passed through the property of the cement plant. In returning from her work in the evening, she usually went north on Fifty-sixth Street to Park Avenue, west on Park Avenue to Sixty-third Street, and north on Sixty-third Street to Valley Junction, and from there by street car to the city of Des Moines.

On the afternoon of June 2, 1921, Miss Thorsdale dismissed her pupils at 2:15, or shortly thereafter, and started by her usual route of travel to Valley Junction. She first stopped at the Albright home, a short distance north of the schoolhouse, and at this place she left a milk bottle, as it was her custom to secure a bottle of milk for her noonday lunch. Mr. Albright testified that it was then 2:20. She visited a few moments, and upon leaving, said that she "must be going, in order to catch her car." She went north from the Albright home to Park Avenue, and turned west on Park Avenue towards Sixty-third Street. She was next seen by Frank Davis and his wife on Park Avenue, about a block and a half west of Fifty-sixth Street. Mr. and Mrs. Davis also met the appellant, who was just a little way ahead of or behind Miss Thorsdale. Davis had known Williams for some time. Another witness, W. C. Anderson, testified that he saw Miss Thorsdale between 2:30 and 3 o'clock on this afternoon, going north on Sixty-third Street, at a point just north of Park Avenue and south of a crest of a long hill, at the foot of which is located the "big red bridge" that crosses the Raccoon River. Charlie King saw Miss Thorsdale going down the hill. He also saw the appellant going down the hill. This is the last place that Miss Thorsdale was seen alive. As she did not return to her home that evening, a search was commenced for her the next day. Her body was not found until the 4th of June, and when discovered, it was lying in the timberland just to the east of Sixty-third Street and north of the Coon River bridge. The body disclosed that death had resulted from a blow from some blunt instrument, presumably a large bridge bolt which was subsequently found a short distance from the body. On the 3d of June, a rubber, Exhibit K, was found, a short distance southwest of the body.

The body, when found, was lying on the back. The clothes of the young woman were raised about her waist, her hair was disheveled, her underclothing was torn, the lower limbs were apart, and one arm was across her face. Her person had been ravished. Dr. Guy Clift, the coroner, testified:

"I was called to where the body of Sara Thorsdale was lying. I made an examination of the body. There was a wound on the head, above the hair line on the left side. There were marks on her throat and face, her elbows were gouged, and there had been an assault committed on the body. This was accomplished after death. Death was caused by the crushing injuries to the skull."

The Hawkeye Portland Cement plant, where the appellant was employed, is located about eighty rods east of Park Avenue from where it intersects with Fifty-sixth Street. Appellant had been working in the plant previous to May 31st, but on that date and on June 1st and June 2d, he had not been at work. Appellant had seen Miss Thorsdale pass the place where he was employed, at different times. He had observed her on the highway, going from the school to Valley Junction. He had inquired, a short time prior to her disappearance, of Carl Scales, one of the pupils at the Clara Barton school, as to which way Miss Thorsdale went in going home, and if she went by herself, and what time she left the schoolhouse.

The appellant gave as an excuse for not being at work on May 31st, June 1st, and June 2d, that he was sick. On June 1st, he was seen to pass along Park Avenue to a point somewhere just west of Fifty-sixth Street, when he cut through a pasture across to Sixty-third Street, and went down Sixty-third Street in the direction of Valley Junction. In traveling this way, he would pass over the same road that was usually traveled by Miss Thorsdale in going from her school to Valley Junction. On the day that the crime was committed, the appellant was at a store near the cement plant, where he purchased some bacon, peppers, and beans, and borrowed twenty cents car fare. This was between 10:30 and 11 o'clock in the morning. From the store, which was located on Park Avenue, the appellant went west on Park Avenue to the home of a colored family, named Griffin, who lived on the north side of Park Avenue, a distance of about

one or two blocks east of the intersection of Fifty-sixth Street and Park Avenue. He talked to Mrs. Griffin, and at that time she noticed that he wore rubbers. Later, Mr. Griffin came, and the family had dinner. They invited the appellant to eat with them, but he declined, and stated that he did not feel well. He remained at the Griffin home until about ten minutes before two, and at that time went west on Park Avenue to the home of Will Aiken, which was a short distance west of the Griffin home, and was so located that it could be plainly seen from the Griffin place. Appellant remained about the Aiken premises for about twenty minutes, and was seen at one time in the vicinity of a small hog house, which was located just to the north and west of the Aiken house. The Aiken home is just a fraction of a block to the east of the intersection of Fifty-sixth Street and Park Avenue, and anyone coming down Fifty-sixth Street, walking north, could be plainly seen from the spot where the appellant was at this time. The appellant was next seen by Frank Davis, just west of Fifty-sixth Street, either ahead of or just behind Miss Thorsdale. He was also seen by Mr. and Mrs. Franklin and Anna Hall, who were driving south from Valley Junction on Sixty-third Street. They saw the appellant at about 2:30 o'clock, seated by the side of the road somewhere along the long hill going up from the river bridge. Mr. and Mrs. King saw the appellant going down the hill to the bridge. When arrested, he admitted to the deputy sheriff that he went across the pasture field that afternoon.

Between four and five o'clock on the same afternoon, the appellant appeared at the pawn shop of O. Cohen, 308 Walnut Street, Des Moines, and pawned the wrist watch that was worn by Miss Thorsdale when she was murdered. The watch was still running. Cohen asked him what he was doing with a lady's watch, and he replied: "Well, it belongs to my girl, and I just want a little money." From the Cohen pawn shop, Williams is not traced further by the State on the day of the murder. On the next day (June 3d), he rode to the cement plant on a truck that hauled the workers of the plant. At this time, mud was observed on his trousers, and some on his knees. Some of the workmen joked with him about the mud, and wanted to know if he had been praying. He went to work at the plant that morn-

ing. In the afternoon, he tried to borrow $5.00 of Mrs. Calovecchio, to enable him, as he claimed, to redeem a watch that evening. Between five and six o'clock on the afternoon of June 3d, he reappeared at the Cohen pawn shop, to redeem the watch which he had left the day before. Cohen asked him for the ticket, and he said it had been lost. He then signed his name on the back of the receipt, and paid Cohen $5.50, and the watch was returned to him. Upon leaving the store, he stopped beside a case near the door, and looked at some men's watches. He was asked by Cohen whether he wanted to purchase a watch for himself, and Williams replied:

"No, but I might trade you this one. My girl don't care very much for that watch, anyway. She might trade."

Finally, a trade was made, and the appellant received a man's watch in exchange for the wrist watch, and Cohen paid the appellant $2.00 additional. Williams then walked three or four doors to the east, to Levich's pawn shop at the southeast corner of Third and Walnut Streets, and there pawned the gentleman's watch which he had just received from Cohen, for $5.00, giving the name of Mason.

On the morning of June 4th, the appellant went to work at the cement plant. During the forenoon of that day, a searching party was formed, which was composed of employees of the cement plant. Immediately thereafter, the appellant stopped his work. His actions are described by witness Stewart, who testified:

"After the searching party was started, Williams quit shoveling; stood there, looking around. First he walked out from the tanks, and he sneaked around the edge of them, looked both ways, up and down, both east and west. He was looking mostly out towards where the searching party was going, out north toward the road. When he went up to the door that led into the hallway, he peeked into the door, and looked back behind him and on both sides of him, as he went in. He didn't come back to work after that. He left his shovel right where he was working."

On cross-examination, this witness said:

"I don't know as he looked like he was tired or sick; he looked excited."

After this, he went to his boss, and told him he had the toothache. Then he went to the chemist of the plant, and complained of being sick at his stomach, and the chemist gave him some aromatic spirits of ammonia. From the cement plant appellant went to the Calovecchio store, where he again complained of being sick, and asked for medicine. At this store he seemed to be quite excited. Mrs. Calovecchio testified:

"I asked him what he wanted. He said he was sick, and wanted medicine, and I asked him what kind of medicine he wanted. He said he wanted medicine; that he was sick. I said, 'Is it in your stomach or is it in your head?' I reached over and got a bottle of Chamberlain's Colic medicine, and said, 'Would that do?' I gave him the medicine, and he didn't stop to wait for his ticket. He always waited for his ticket before. At that time, the searching party was just a little west from the store. They were going west. I didn't see Williams again that day."

Miss Thorsdale's body was found by a boy scout, about .11 o'clock on the morning of June 4th. About 4 o'clock on the afternoon of the same day, Williams was arrested, and at the time of his arrest, was in a drunken condition.

On the evening of June 2d, appellant was seen in Valley Junction, between seven and eight o'clock. At that time, he was at Fourth and Maple Streets, and was going east on Maple Street in the direction of the cement plant, and in the direction of the spot where Miss Thorsdale's body was found, two days later.

After his arrest, the appellant was confined in the Polk County jail until June 19th, when he was released. Up to this time, appellant had denied his guilt; but no statement had come from him relative to the watch or in regard to Davenport, of whom it will be necessary to speak later. After his release, appellant went to Fort Dodge. He returned to Des Moines, remaining a week, according to his testimony, and then went to Oakdale, and from Oakdale to Iowa City. From there he went to Burlington, then to Keokuk, where he got into a fight with a girl, as he states, and then went from there to Fort Madison, and back to Burlington. Then he went to Fort Madison, and from there to Ottumwa, stopping at Fairfield on the way. He

remained at Ottumwa from three to five days, and then went to Albia, where he stayed one night. From there he went to Buxton, where he remained two days, and from Buxton to Chariton, where he was rearrested on August 19, 1921, by the sheriff of Lucas County. At the time of his arrest, he denied that his name was Joe Williams, but later admitted that it was. The sheriff, knowing that Williams was wanted in Des Moines, asked him where he was on the afternoon of June 2d, to which he replied that he was full of moonshine on the afternoon of June 2d, and did not know where he was or what happened. He was then returned to Des Moines, and while in the county jail, made admissions for the first time relative to the pawning of the wrist watch, which he then believed was in the possession of the officers. Prior to this, he had denied that he had any connection whatever with the watch.

In explanation of his possession of the watch, he first told Cohen that it belonged to his girl, and afterwards said that he got it in a crap game on the east side, in an alley, on the 7th or 8th of May. About this time, and for the first time, he implicated another colored man, by the name of George Davenport, who, he claimed, gave him the watch to pawn, and who, he claimed, had made statements to him, on June 19th, indicating that he (Davenport) had committed the crime. These implications were first made on August 22d, three days after he had been arrested the second time, charged with the murder. On this date, appellant, for the first time, repudiated his former statements that it was his girl's watch, and his later statement that he had won the watch in a crap game.

The sufficiency of the evidence to sustain the verdict is not questioned on this appeal. The points and propositions advanced by appellant upon which he predicates a reversal have to do with certain legal phases of the case, involving primarily the admissibility of evidence.

I. Did the trial court err in refusing to permit appellant's witness Harriet Martin to testify, on redirect examination, in explanation of the date to which her testimony referred?

At the time of the murder of Sara Thorsdale, she was wearing two rings, one of which was a gold band ring, with a black

onyx setting.   Subsequently to her death, this ring was never
seen by anyone.   It is the claim of appellant
1. WITNESSES: that George Davenport had in his possession a
examination:
inducing    ring similar to the ring in question, and that he
change in
testimony.   displayed it at Chariton, Iowa, to a colored
woman by the name of Harriet Martin.   This
witness testified upon direct examination as follows:

"I know George Davenport, and have known him for five
or six years.   I saw him in April, 1921.   He was working at
Chariton, and in April he stayed two nights at my house.   I
saw him again, along in June or July.   He was at my house.
He had a little ring on his finger, that he asked me did I want.
He would give it to me.   This was a little ring, with a black set
in.   The part was made out of gold."

Upon cross-examination, the record discloses the following:
"Q.   At the time Mr. Davenport came there and brought
you this ring,—that was in April, wasn't it?   A.   I think it was
in April.   I would not be sure.   Q.   It was while he was working
at the depot, wasn't it?   A.   Yes, I think so.   Q.   That is when
he came there and offered you the ring, wasn't it?   A.   Yes, sir."

It is quite apparent that, if Davenport tendered this ring
to the witness in the month of April, then it was not the ring
that was taken from the person of Sara Thorsdale.   Upon re-
direct examination, counsel for the appellant, by a leading ques-
tion, attempted to elicit an answer from the witness that it was
in June or July that Davenport had the ring in his possession.
To this question objection was made, and sustained by the court.
Further questions were asked by counsel for appellant as fol-
lows:

"Q.   Just tell the jury where he would have this ring,—
on his finger?   A.   When he came to my house, he had it on
his finger.   Q.   That was when?   A.   When he was—when he
was at the depot or when he left the depot.   I cannot say ex-
actly, because I did not know it was ever going to come up."

A further question was put to the witness, involving the
time when Davenport had this ring on his finger, to which an
objection was made and sustained, that the question called for
mere repetition; that the witness had already answered; and
that it was not proper redirect examination.

It is for the trial court to determine how far counsel may go by way of repetition and re-examination of a witness as to matters to which the witness has already testified, and an appellate court will not interfere with the exercise of this discretion, except when the ruling results in gross abuse, or an injustice to the defendant ensues. *State v. King,* 122 Iowa 1. After this witness had testified, to the best of her knowledge, belief, and recollection, as to the time that the event occurred, it was not proper for counsel, by suggestion or leading questions, to attempt to elicit a contrary statement. Appellant was not in a position to cross-examine his own witness. On the direct examination, she refers to two different times that she saw Davenport at her house in Chariton. When she was asked what, if anything, took place there, she undoubtedly did not intend to testify in regard to which time the ring incident happened. By inference, it is argued that she intended to refer to the month of June or July; but, upon cross-examination, she stated that the incident happened in April, and that it was while he was working at the depot. He worked at the depot in the month of April only. The trial court had a right to take into consideration the character of the witness, her intelligence or lack thereof, and whether or not she was susceptible to the suggestion contained in leading questions. The rulings involved judicial discretion. In the absence of an abuse of that discretion resulting in prejudice to the appellant, we will not interfere.

II. Did the trial court err in permitting the State to introduce evidence proving or tending to prove that the appellant had committed other crimes, independent of the crime for which he was on trial? Ordinarily, proof of separate and distinct crimes is inadmissible. The rule is well established. But where the evidence of other crimes is merely incidental to other proper evidence, the rule does not apply.

2. CRIMINAL LAW: other offenses: Λwaiver of error.

At the outset, it may be stated that, when the appellant took the witness stand, among the first statements made by him on direct examination was:

"I am married, but do not live with my wife. I have been confined in the state penitentiary of Oklahoma for stealing

money. I was confined in the penitentiary of Iowa for robbery. I was paroled from my conviction in Iowa June 25, 1918.''

These matters were also called out by appellant on the cross-examination of witness James McDonald.

It appears that James McDonald, a former police officer of the city of Des Moines, had a talk with appellant, prior to the trial and subsequent to his second arrest, in which conversation appellant related in considerable detail the story of his life. McDonald was called as a witness for the State, and was asked with reference to these conversations. The material admission made by appellant to McDonald had reference to a lady's wrist watch which appellant had pawned on the day that the crime was committed. In detailing the conversation, McDonald testi-fied as follows:

''Along about the 24th or 25th of August, we had a conversation about some rings. That was the lady's two rings that were taken from her body. We went over Williams' past record.''

At this point, the following question was asked:

''Q. What was it,—what did he tell you about his life? A. He started to tell me, and told me that he was born down in Mississippi; that he had left there when he was a kid, and came up to St. Louis.''

An objection at this time was interposed, on the ground that the testimony is incompetent, irrelevant, immaterial, and no part of the *res gestae*, and had been obtained by duress, while appellant was under arrest. This objection was overruled. No motion to strike the testimony was made. The witness then continued the narrative of the story that Williams had told him, and among other things, testified that appellant said he got into trouble in Oklahoma, and was sent to the penitentiary for stealing. The witness then proceeded, without objection, to detail certain events which appellant had told him, and among other things, that he had been sent to the Fort Madison penitentiary.

''Then he went on and told me he had been run out of Keokuk several times, for getting in trouble with women. Also told me that, after he left here, after he was released by the sheriff after this murder, that he went to Keokuk.''

At this point, appellant renewed his prior objection, but

did not seek to strike the testimony from the record, and proceeded to cross-examine the witness.

In the cross-examination of McDonald, after stating his relations to the case and his work as a detective, he testified that the appellant did not try to conceal anything from him. He said:

"He told about his being confined in the prison in the state of Oklahoma. He told me he was guilty of that offense of taking some money. He also told me about being sent to the penitentiary from Burlington, Iowa. He told me he was not guilty of that. Q. In other words, so far as you know, Jim, in everything he told you he told you the truth? A. As far as I know, —yes."

The record shows that, on direct examination, after a question had been propounded to this witness in relation to the conversations he had with the appellant, and a partial answer had been made, an objection was interposed,—not to the question propounded, but to the answer to the question. Up to that point, the answer may not be said to be prejudicial. It may also be said that no objection was made to any question, nor was a motion made to strike any answer given by this witness with reference to the statements made by the appellant. The trial court had no opportunity to exclude the testimony of the witness with reference to any statement or admission by appellant, unless the court should have acted on its own initiative. With this state of the record, the appellant is not in a position to complain. We may indulge the presumption that, had appellant entered proper objections or made a proper motion, the trial court would have relieved the record of the admissions of the appellant to which complaint is now directed, and properly directed the jury in regard thereto.

III. Did the trial court err in permitting Al Stader, a witness for the State, to express his opinion as to the guilt of the appellant?

The statement of this proposition, isolated from the record, would clearly constitute reversible error. It is

3. CRIMINAL LAW: appeal: review: incompetent testimony.

necessary, therefore, to understand the setting under which the expression of opinion was made. It appears that there were certain persons con-

nected with the office of the sheriff of Polk County who were attached to the belief that Williams was innocent and Davenport was guilty of the crime charged. This belief found lodgment in the record on this trial. Mat Theis, a deputy sheriff, was called as a witness in behalf of the appellant. This deputy, with other persons, had taken the appellant, on June 4th, to the Harbach undertaking parlors, where the body of Sara Thorsdale had been removed after its discovery. Theis testified:

"I pointed my finger to the body, and asked him [appellant] where he had ever seen that girl before. He told me about meeting her on the road, one time, coming in from Valley Junction, and that he had let her through a barbed wire fence, sometime in February. I did not notice anything unusual about Williams' appearance nor his actions when he viewed the body."

Upon cross-examination by the State, as bearing upon his interest in the outcome of the trial, he testified that he was at Anamosa about the 4th day of January, 1922, and that he had a conversation there with a couple of gentlemen in the depot, one of whom was Al Stader, of Ankeny.

"In that conversation was discussed the Thorsdale murder. Q. Didn't you say, at that time and place, to Al Stader, this, or this in substance: 'They won't convict Joe Williams, if we can help it?' "

To this question he answered in the negative. Stader was called as an impeaching witness, and testified that Theis had asked him whether or not he thought Williams was guilty, to which the witness testified that he had replied: "I says, 'I think he is as guilty as hell.' " Motion was made to strike this answer, and it was sustained. In making answer to appellant's contention, it is necessary to understand the record.

On direct examination of this witness by the State, Stader testified that, at the time and place in question, Theis said, "They won't convict him if we can help it." Upon cross-examination, it was elicited by appellant that this was not all of the conversation. He testified:

"Quite a little conversation took place there. They said quite a number of things about the case. He said, 'We have made a great deal of investigation of this case. We have traced

down every clue, and we believe Joe Williams is innocent.' He said this after the first assertion.''

Upon redirect examination, the State inquired into this further conversation, and, upon objection made by appellant, the court said:

''You fellows opened that matter up. You let down the bars. You may answer.''

After a somewhat detailed statement as to the occasion of the conversation, the witness said:

''He [Theis] asked me what I knew about the case, and I said, 'I have followed the case.' ''

The witness apparently was hesitant to answer directly the question formerly asked him, and the court said: ''You know what the question is?'' To which the witness answered:

''He [meaning prosecuting attorney] asked about the whole conversation,—that is what I am trying to tell him. I was asked what I had said to Mat Theis and what he said to me. He says, 'Do you think the man is guilty?' and I says, 'I think he is as guilty as hell.' ''

It is sufficient to state that all that could be done, under the circumstances, was to move to strike the statement. All the court could do was to sustain the motion. No further request was made by the appellant. There was no effort on the part of the State to inject this matter of opinion into the record. There was no misconduct. We will not presume prejudice. It was simply one of the unexpected things that sometimes happen in the trial of a case, and we have no right to say that either court or counsel could have anticipated the statement that was made. The State did not open the door which called for the entire conversation. With this view of the situation, reversible error may not be predicated.

IV. Does the record disclose that the trial court permitted the introduction of testimony while appellant was absent from the court room?

There is no affirmative showing in this record that any testimony was offered during the absence of the appellant. He was shown to have been present at the commencement and at the conclusion of the trial, and this court will presume that the

4. CRIMINAL LAW: trial: presence of accused: presumption.

appellant was present at all times, unless the contrary is affirmatively shown. *State v. Wood,* 17 Iowa 18.

V. Did the court err in admitting, over objection, certain exhibits, known as C, D, E, and K?

Exhibits C and D were photographs taken of the body of Miss Thorsdale, one of which shows the position in which the body was when discovered, and the other shows the head, with the accompanying wound. Photographs which

5. EVIDENCE: documentary evidence: photographs of body.

tend to prove the manner in which a crime was committed, or the motive for the crime, are admissible. Photographs may also be admitted for the purpose of identification, and to disclose, as

the first photograph does, the environment of the crime when committed. We discover no legitimate reason for their exclusion on the trial of this case.

Exhibit E is a whisky bottle, found at the scene of the homicide about the time the body was discovered. It is evident that anything found in the immediate vicinity of the body that bears a relation to the crime committed was compe-

6. EVIDENCE: demonstrative evidence: articles at scene of homicide.

tent. True, it was not established that the bottle was ever in the possession of the appellant, but, under the circumstances, this is not a reason for its rejection. At the time of appellant's

arrest at Chariton, Williams told a police officer, in response to a question as to where he was on the day that Sara Thorsdale was murdered, that he was sick, and that he went to the doctor and got some medicine, and that "in the afternoon he got some moonshine whisky, and didn't know where he was. He told me a second time that he didn't know where he was that afternoon."

Nor is the complaint as to Exhibit K of any weight. This exhibit is a rubber that was found very near the scene of the crime. One of the State's witnesses testified that, when appellant was at her house, at noon of the day that the crime was committed, "he had on a pair of rubbers." It is also shown that he purchased a pair of rubbers at the company store in the latter part of the preceding December. The evidence shows that the rubber was a fit for the shoes that were worn by the

appellant. Under these circumstances, the court correctly admitted the exhibit in evidence.

VI. Did the court err in permitting a witness called on behalf of the State to give the reason why another witness called by the State was not present at the trial?

There is no merit in this assignment. One Kersher, who was under subpoena by the State as a witness, failed to appear at the trial. Another witness, named Krarup, was permitted to state that Kersher had been accidentally killed the night before. We fail to discover any prejudice resulting from this statement of fact, as no unfavorable inference could be drawn by the jury from the knowledge of the death of this witness.

VII. Did the trial court err in permitting Frank Bowlin, a witness for the State, to testify that he saw the appellant, Williams, cross the Anderson pasture on the day before the murder of Miss Thorsdale?

This pasture is near the corner of Fifty-sixth Street and Park Avenue, and near the highway traversed by Miss Thorsdale in going from her school to the street car. It was competent for the State to trace the movements of this appellant, not only on the day the crime was committed, but immediately prior and subsequent thereto. It is apparent that the motive of the brutal offender was not robbery, but ravishment. It was competent for the State to prove the motive, and to show circumstances which would tend to prove premeditation and deliberation. The record discloses that this appellant, prior to the commission of the crime, made inquiry of one of the pupils of the Clara Barton school in which Miss Thorsdale was a teacher, as to which way she traveled in going from the school, and whether she usually went alone or was accompanied by some person. The appellant also made inquiry as to when she arrived at her school in the morning. He had previously seen Miss Thorsdale on the road leading from the schoolhouse. In the light of this testimony, the jury might well ask what peculiar interest inspired the appellant in making an inquiry concerning the teacher and her movements in a matter that did not concern him. The State also showed that this appellant, on the day preceding the murder, went over the route usually taken by Miss

7. EVIDENCE:
relevancy:
movements
of accused.

Thorsdale. The State also proved that, on that day, appellant was not working at his usual employment, nor had he been the day previous, nor was he working on the day the crime was committed. The pasture incident was inquired into, and properly so, as it tended to show his movements and his familiarity with the territory where the crime was committed. The character of the objection, in the light of this record, is not of sufficient dignity or worth to merit further attention.

VIII. Was the instruction of the court in its definition of alibi erroneous?

This is the only instruction given by the trial court that is disclosed by the record before us, and no exception was saved to this instruction, except that, in the motion for a new trial, an omnibus objection was made to the instructions given. In this motion it is recited, "29. That the court erred in giving the following instructions to the jury;" and then are enumerated some seventeen instructions, by numbers, including No. 10, the alibi instruction. Waiving this point in appellate practice and procedure, is the instruction in question subject to legal criticism? Undoubtedly, this instruction was given by the trial court out of an abundance of caution. Had the court failed to instruct in this particular, and error was assigned for that reason, this court would not reverse, under this record.

8. CRIMINAL LAW: alibi: instructions.

Turning to the instruction, we find in the first paragraph thereof the following language:

"One of the defenses relied on by the defendant in this case is what in law is known as an alibi, which means that the defendant was at another place than the one where and at the time when the alleged crime was committed."

This court has defined a definition to be "such a description of the thing defined, including all essential elements and excluding all nonessential, as to distinguish it from all other things and classes." *Porter v. Mapleton Elec. Lt. Co.,* 191 Iowa 1031. Measured by this definition, this part of the instruction is not subject even to verbal criticism.

But it is claimed that, in the next paragraph of the instruction, the trial court used language that was subject to the criticism of this court in *State v. Ireland,* 192 Iowa 489. In the

light of the record, the point is not well taken. In the *Ireland* case, it is said that the circumstances of a given case might be such as to justify the giving of the objectionable paragraph in that case. There was no confusion in the minds of the jury in the instant case as to the meaning of the term ''alibi.'' No element of the definition was unduly emphasized, and the instruction was applicable to the facts of this case, so far as those facts justified the giving of the instruction in the first instance. Any person of reasonable intelligence could understand the thought which the court intended to convey, and the jury is presumed to be composed of men and women of average intelligence. It would be far-fetched for an appellate court to predicate error in the giving of this instruction, under the circumstances of this case.

IX. Did the trial court err in permitting George Davenport, a witness for the State, to recite the so-called ''third-degree methods'' used by the sheriff of Polk County in an attempt to extort a confession from him? A brief review of the situation presented by the record is essential to an understanding of the question involved at this point.

9. CRIMINAL LAW: evidence: self-serving declarations of innocence.

The appellant testified as a witness in his own behalf. He denied having had any connection whatever with the offense charged, and as a part of his defense testified to certain facts for the purpose of showing, and having a tendency to show, that one Davenport, and not he, was the guilty party. Such a defense is one recognized by the law, and evidence to support the same was proper. In rebuttal, the State produced Davenport as a witness, and he testified in direct contradiction of the matters to which Williams had testified, tending to fix guilt of the offense upon Davenport. All of this was proper. But the State did not stop here.

Over timely objections by the appellant, the State then proceeded to prove by Davenport a certain transaction between Davenport and certain persons connected with the sheriff's office, of which Williams had no knowledge whatever. Davenport testified, on direct examination in rebuttal in behalf of the State, that, one night, at about one o'clock in the morning, he was taken out of the county jail, by the sheriff and a deputy and a

druggist, into the woods near Valley Junction. His recital was as follows:

"As we were going out, Sheriff Robb asked me if I knew of the Ku Klux Klan in the south,—if I had ever seen them. I told him I never had, but had heard some talk of them. He said, 'Well, we have a membership here of two hundred;' and he said, 'Our purpose for this is to deal with men that commit crimes like you have committed.' And I says, 'What do you mean by that?' He says, 'Well,' he says, 'I mean we are going to take you out here and finish you.' I says, 'Sheriff Robb, you are going to take me out, you mean to tell me, and finish me, without a trial or anything to know whether I know anything about this or not?' He says, 'Well, you won't get any trial,' he says, 'we are going to take this in our hands and handle it;' and he says, 'Members are waiting all along the line for us.' So I says: 'I never committed that crime; I don't know anything about it; and I never seen the woman.' He says: 'You are a damned liar. You know all about it. I have your finger prints and all.' He says, 'You are the very man.' He says, 'You are trying to put it on that poor innocent man Williams.' I says, 'I am not trying to put it on anybody, because I simply don't know anything about it.' He says, 'You can tell me that, but you will tell a different story before long.' As we went along the road, there was an automobile stood by the side of the road, with about eight or ten people there, and I thought they were the Ku Klux Klan. We drove right up to them, and he says, 'Here are some of them now.' I says, 'There are women in this bunch.' I says, 'Do women do that, too?' He says, 'Yes, women and men and all are in it.' So we went around and on up, and he says, 'This is not the people.' He says, 'This is not them; I thought it was.' So we drove on around until we got to the cement plant, and when we got right across from the cement plant * * * we turned at the cement plant where that road goes north, and we drove up past a grocery store, up a little hill, like, and when we got part way up, there is a little road goes down there, or seemed to be a road to me,—I could not see,—it was dark, you know,—but it seemed there is; when the sheriff ordered them to stop, and give the signal for the rest of the Ku Klux Klan * * * After they turned out the lights

two or three times, the sheriff said, 'That is enough; they will come on.' He says, 'Drive on.' They drove on around a while, until they got to going down a hill, and drove across a bridge about twenty or twenty-five feet; and he ordered them to put the car off to one side, and they pulled the car off to one side; and just as we were getting out, another big car came rolling across the bridge; and he says, 'Here are some of them now;' but this went on by, and he ordered them to turn out the lights. After they had went by, they took me out of the car with the chain on me, and took me over in the woods. They begun to kind of argue among themselves as to which was the spot where the body was found at, and finally Sheriff Robb says, 'Here is where we will do the work,' and went and started over there; and when he got there, he says to me, he says, 'Now, is there anything you want to say?' 'Well,' I says to Sheriff Robb, 'there is not anything I want to say. You say I am a damned liar for anything I want to say, and there is nothing I want to say; but I will pray, if you will permit me;' and he says, 'All right.' Whereupon I knelt down and said a prayer. * * * It was a short prayer. I say: 'Lord, I am calling upon you this evening to witness the crime that these men are about to commit on this spot which,' I say, 'is the same place where I am told just a month or so ago this poor girl was murdered; and as Thou lookest down, Thou knowest I am not the guilty man, for that is so. But I am powerless to help myself. I am asking Thy help. You know I have always been taught from the cradle to respect and honor the white man in every respect, and since I have been taught that, I have had no cause to wish to go back on my teaching; and since I was to die, I would ask Thee to forgive these men, to forgive this murder; and Lord, I would ask Him to take my body and receive it into His kingdom, for the Lord, Amen.' These are just the words I said. Then the sheriff, Robb, tried to induce me to say that I wanted to send word to somebody * * * I told him I didn't have any word to send to anybody. 'Well,' he says, 'now I want to see,' he says, 'now I am going to give you one more chance,' he says, 'to tell me you did commit that murder.' He says, 'Did you commit that murder?' I say, 'I done said, Sheriff Robb, you must do your work.' I says, 'I have told you all I can tell you.' Then this man

Franck, he says, 'Oh,' he says, 'what do you want to argue with the son-of-a-bitch for?' He says, 'Give me the chain,—you go on off over there.' And Sheriff Robb handed him the chain, and walked on off at a distance; and the other deputy,—I don't know just who he was,—but he backed off about ten feet out on front of me, and Mr. Chapman, he stands on the west side of me,—he was about five or six feet off to the side, off to one side, and out of the way, just as though you would back off from a man, or something, to get a good shot, and thought you was to good killing distance. That is the way these men did. Then he stood there a while, and then he came walking back up. Sheriff Robb came and took the chain out of Franck's hands, and says, 'I am going to give you one more chance to tell the truth.' I say, 'Sheriff Robb, I told you,' I said, 'all I am going to say, and all I can say;' and he says, 'Well,' he says, 'we are going to kill you. You are lying, and you know it.' So when Franck and this other deputy they began to get the brush, they began to throw brush up around me, and then they began to scramble a paper around, and a match, in order to light the brush. Then the sheriff said to Mr. Franck, he says, 'This is too long; go and get that rope.' He went and got a rope out of the car, and they brought the rope in, made a loop, put it over my head, and threw it over a limb. Then they had to have a little counsel of themselves, and then—I don't know which one it was—they suggested they go back and get this other man. Q. I will ask you if there was not a shot fired there. A. That was while I was on my knees. Sheriff Robb, while standing holding the chain, standing right up against me and sticking down between him and I on the ground, and shot down between him and I on the ground, and shot down between him and I. I don't think there was more than gun-barrel space between us while he was standing there. He shot the shot off, and this other business taken place after. It was while I was on my knees the shot was fired. If any other shot was fired, I didn't hear it.

"Q. I will ask you to state whether or not, at that time, you believed you were about to be killed. A. Well, I thought I was, because I didn't see nothing to prevent it. Q. Go ahead and tell us, after they got the rope, what was done there. Now state what next took place out there. A. Put the rope around

my neck, and after they put it around my neck, threw it over a limb, and pulled me up, and let me back down. Then somebody made the suggestion it might be a possibility of going too far, and asked that I be taken back and get the other man, and see what he said. I think that was Mr. Chapman. Then Sheriff Robb agreed upon it to go back and get the other man, and at the same time to get the gasoline, and they led me out and put me in the car and brought me back down, and when I got into the jail offices, the clock struck three * * *''

All of this evidence was admitted over timely and proper objections, which were overruled by the court.

While this proceeding was being enacted with Davenport, the appellant, Williams, was locked in jail, without the slightest knowledge, in any way, shape, or form, that such an affair was contemplated or was being carried out.

The court held that this evidence by Davenport, given in rebuttal in this manner, as to what he said and did under these circumstances, was admissible, for the purpose of proving that Davenport was innocent. It could have been admissible for no other. Here was a situation where Williams, as part of his defense, was claiming that Davenport was the guilty party. Davenport denied the circumstances to which Williams testified, tending to show that he was guilty. He was also allowed to corroborate himself by proving that, at a moment when he appeared to be facing immediate death, he called upon his Maker, in the dramatic manner detailed, to witness his protestation of innocence. The State did not display this evidence for the purpose of proving a farce, but rather as a solemn and serious tragedy. The sole purpose of this testimony was to prove, not only that Davenport was asserting his innocence upon the witness stand, but also under the circumstances disclosed, and that, when he believed he was in the presence of immediate death, he fell upon his knees and solemnly called upon the Almighty to witness his innocence of the crime.

It is needless to discuss the probable effect upon a jury of permitting a recital of this dramatic character. No reasonable person will contend for an instant that it was not highly prejudicial to the appellant's cause. It is an elementary proposition that no witness for either State or defendant can be allowed to

corroborate his own testimony by any such self-serving declaration as this. Davenport was not only permitted to deny Williams' story, but also to proceed, over objection, to corroborate himself by proving that, at a time and place that Williams knew nothing about, he, Davenport, had told the sheriff and those with him, and the Almighty as well, that he did not commit the offense. If such evidence is admissible, why stop with such a scene as this? Why not produce other witnesses *ad libitum* whom the witness may have told that he was innocent of the offense? If such evidence as this is admissible to corroborate and bolster up the testimony of a witness, we have reached a somewhat anomalous situation in regard to evidence in a criminal case.

Let us suppose that, under the circumstances disclosed, Davenport had admitted his guilt. If all question of duress or fraud in obtaining such admission were waived, and even if it had been freely and voluntarily given, it could not have availed Williams as a defense. To state the proposition somewhat according to the books, the voluntary confession of a third person that he is the guilty party cannot be proved as a defense by one accused of crime. Such is the pronouncement of the Supreme Court of the United States in *Donnelly v. United States*, 228 U. S. 243, and such has been declared to be the law of the courts of last resort of a great majority of the states of the Union. The cases are collected in Ann. Cas. 1913-E, 719, and 37 L. R. A. (N. S.) 345.

If a defendant in a criminal action cannot prove the declarations of another party in which such party admitted the commission of the crime, it must, by all rules of logic, follow that a third person claimed by the defendant to have committed the offense may not prove his own declaration to other parties to the effect that he is innocent. To admit such declarations is to entirely abrogate the rule regarding hearsay testimony and self-serving declarations. This cannot be done.

It is suggested in argument that this evidence was admissible because it tended to prove part of a conspiracy on the part of Williams and the "sheriff's office" to fix the crime upon Davenport, rather than upon Williams. This contention is based upon evidence that Williams and Davenport were placed

in the same cell in the jail, while deputy sheriffs in an adjoining cell listened to the conversation between them, and that Williams consented to this plan with the officers, and carried on a conversation in the cell with Davenport under these circumstances.

The record in regard to this transaction disclosed that, upon the rearrest of Williams, and on the third day thereafter, the "sheriff's office" first learned from Williams the part that he claimed Davenport had played in the crime. Williams, for the first time, and in contradiction of his former statements, claimed that he secured the wrist watch from Davenport. On that day an information was filed and a warrant issued for the arrest of Davenport. This information was sworn to by Ray Lockard, who was acting as a special deputy sheriff, under Sheriff Robb of Polk County. Davenport was arrested, and confined in the Polk County jail; but he was not told for what crime he was arrested. On the same evening, Sheriff Robb, Lockard, and other deputies brought Williams from his cell to the office of the sheriff in the county jail, and Williams was told that Davenport was under arrest, and that it was up to him (Williams) to disprove the statements in reference to the watch, and other matters against him, and that they were going to give him a chance, and intended to put Davenport in the cell with him, and that these deputies or others would be listening, and that this was his opportunity to show that Davenport killed the girl.

As a part of the same plan or scheme, Davenport was also called in privately, and was told that he would be placed in the cell with Williams, and that he should find out from Williams about the murder of Miss Thorsdale. Davenport at this time did not know that Williams was acting under similar instructions. Davenport was placed in Williams' cell, and deputy sheriffs and others were placed in cells on each side of the one occupied by Williams and Davenport. Some of the persons who were "listening in" claim that Davenport made some statements which were offered as admissions indicating that he knew something about the death of the girl. About one o'clock in the morning, Davenport was taken out of the cell, and was told that whisky would be furnished, or sent to the cell, and that he and Williams were to drink it, and to see in that way if something

more could be found out.  Davenport was again placed in the cell, and shortly thereafter, a colored fellow by the name of Sam Greer was placed in the cell, with a bottle of whisky, which the three men drank.  It is claimed by the State that the whole transaction was an attempt to get some admissions or statements of some kind out of Davenport, and that Williams occupied the vantage ground, and was really taken into the confidence of the sheriff in the scheme.  It appears, however, that each party was informed that he was to endeavor to secure some admission of guilt from the other.  One was quite as much "in the confidence of the sheriff's office" in this transaction as was the other.  It was a case of playing one against the other.  There was as much of "a conspiracy" between Davenport and the "sheriff's office" as there was between Williams and the "sheriff's office."

But there is no proof whatever that there was any "conspiracy" that contemplated taking both Davenport and Williams separately to the scene of the murder, and attempting to extort a confession by the methods resorted to.  Appellant knew absolutely nothing of this transaction with Davenport.  How, then, can he be said to have "conspired" to bring it about?  There is not in the entire record a hint, claim, or suggestion that the transaction in the jail cell had any connection whatever with the affair with Davenport at the scene of the tragedy.  It is not shown that the same parties were present at the two transactions, —in fact, the contrary appears in the record.

Furthermore, the record shows that, after the parties returned with Davenport from the scene of the murder, in the early hours of the same morning, they immediately took Williams from his cell and transported him to the same spot, and proceeded to endeavor to extort a confession from him by the same general methods adopted in dealing with Davenport.  Enough was admitted by the court to show that the trip was undertaken, but the evidence as to what transpired with Williams was excluded, upon objections by the State.  An offer of the testimony was made in the record in the absence of the jury, and it appears therefrom that very much the same procedure was resorted to with Williams that had been adopted with Davenport, with the same general result.  If Williams "conspired" with the "sheriff's office" to have Davenport taken to the scene

of the crime, did he also "conspire" to have himself treated in the same way, the same night?

It was not error to exclude the evidence offered by appellant as to this midnight expedition with him, although it is proper to observe that consistency would suggest that a defendant should be entitled to quite as great a latitude in the introduction of self-serving declarations as the State. However, there was ample evidence admitted to rebut any suggestion that Williams and the officers had entered into any "conspiracy" that opened the door for Davenport's self-serving declarations. Williams is hardly to be presumed to have been a party to a conspiracy (of which he knew absolutely nothing) to subject both Davenport and himself to the "third-degree" methods resorted to by the officers.

Even if the jury could have been permitted to speculate as to the so-called "conspiracy," as a wholly collateral issue, there was no evidence to support it, but just the contrary, so far as anything connected with Davenport's declarations at the scene of the murder is concerned. To say that there was a "conspiracy" to which Williams was a party, and which permitted the introduction of this self-serving declaration on the part of Davenport in rebuttal, is a wholly unwarranted assumption, that finds no support whatever in the record, and furnishes no justification for the introduction of this highly prejudicial and improper testimony.

This tribunal is not constituted for the purpose of passing upon the question of the guilt or innocence of persons charged with crime. That is the function of the jury. Under the Constitution of this state, the duty resting upon this court is to determine whether or not one charged with crime has been tried in accordance with the established and recognized rules of law. If he has not been so tried, then there is but one thing for this court to do, and that is to reverse the case, in order that a trial may be had in substantial accordance with established legal requirements. Such is the plain duty imposed upon us by the Constitution. Whether we believe a defendant to be guilty or not guilty cannot enter into a determination of the duty resting upon us. We have no other alternative than to declare the law as we find it to be.

For the error pointed out, the judgment of the trial court must be, and it is, reversed, and the case is remanded for a new trial.—*Reversed and remanded.*

WEAVER, EVANS, and STEVENS, JJ., concur.

PRESTON, C. J., ARTHUR and DE GRAFF, JJ., concur as to all except Division IX of this opinion, and as to said division they dissent.

PRESTON, C. J. (dissenting.)  Firmly convinced, as I am, from the record, that the defendant is guilty, I respectfully dissent from the reversing opinion of the majority.

No one can read this record and not be convinced beyond all doubt that this defendant took the life of Miss Thorsdale. I understand all to so concede.  Against all the array of witnesses and testimony against the defendant, there is no word of evidence to the contrary, except that of the defendant himself, interested, impeached, and discredited as it is, not only by contradictory statements, but by his past life.  As said in *State. v. Wegener*, 180 Iowa 102, 127:

"Surely, therefore, in the light of our previous cases, we ought not to ignore the state of the record before us, with its overwhelming evidence of guilt. * * * If I am right in saying that upon this record an acquittal or disagreement of the jury would have been a clear miscarriage of justice, will a reversal by us upon this ground be anything otherwise?"

Quoting again, from the opinion of one of the judges of the Supreme Court of the United States:

"The matter is one of gravity.  The delays incident to enforcement of our criminal laws have become a national scandal, and give serious alarm to those who observe."

Wrongly to reverse this case upon unsubstantial grounds may produce unfortunate consequences.  It was one of the most brutal murders that could be imagined, and one of the most brutal ever committed in this state.  I concede, of course, that, even so, the defendant is entitled to a fair trial.  That is so in every case.  That does not necessarily mean a perfect trial. There are few such.  On the other hand, under this record, there ought not to be a reversal for a trivial or trifling error.  In my

opinion, the evidence upon which the case is reversed was admissible. The evidence abundantly shows a conspiracy between this defendant, on the one hand, and the sheriff and his office force on the other, to falsely accuse Davenport as the perpetrator of the crime, for the purpose of casting suspicion on some other person, and to shield the accused. For defendant to so falsely accuse is, of itself, always evidence of guilt. I think it was an afterthought on the part of defendant to charge Davenport with the offense. It was some little time after the murder was committed that it occurred to him to so claim. From that time on, defendant and the sheriff and others of his office force were in collusion, acting together, for the sole purpose, so far as this defendant was concerned, of shielding himself and diverting suspicion to some other person. I shall not refer to the circumstances tending to show a conspiracy to that end, in which the defendant participated, and of which he was, indeed, the instigator. It is set out in the majority opinion. It is enough to refer to the secret trap laid by defendant and the sheriff, and the furnishing of whisky in the jail transaction. It is stated very positively in the majority opinion that this defendant knew nothing of the purpose of the sheriff to take Davenport out to the scene of the murder for the purpose of extorting a confession. To my mind there is a strong inference, from what had gone before, that the defendant did know, and that it was in furtherance of the prior plan. It is said by the majority that there was as much of a conspiracy against Davenport as against Williams, because afterwards Williams was taken out to the scene. But there is nothing in the record to show that the sheriff and Davenport were at any time acting together for the purpose of fastening guilt upon Williams. If the sheriff and the others had secured, as they expected, a confession from Davenport, there would have been no occasion to thereafter take Williams out. It may be that the sheriff "double-crossed" them both, and, having failed to secure a confession from Davenport, thereafter conceived the idea of adopting similar methods as to Williams. The evidence that such methods were used on Williams was not admissible, because there was no claim that any confessions or admissions were secured from Williams by these means. The State was greatly handicapped by the con-

duct of the sheriff, and was forced, by the attitude of the defendant, acting with the sheriff, to appear to be defending Davenport. The whole matter was opened and the bars let down by this defendant. It often happens that the defendant places on trial somebody else, who is not under indictment. The State had the right to show that this defendant, then on trial, was guilty. It is said that the prayer of a righteous man availeth much. Whether Davenport is a righteous man we do not know. In any event, his so-called prayer avails the defendant on this appeal. Davenport, as a witness, after the outrageous midnight proceedings, under the solemnity of an oath, said precisely the same thing,—that is, the same ultimate fact,—as he did in the so-called prayer: to wit, that he was not guilty. True, he did not say it in the same words; but his statements when, as he supposed, he was about to be lynched, were mere emphasis. We often hear witnesses on the stand do the same thing, by stating, by way of emphasis, that they hope God will strike them dead if they are not telling the truth, or by calling God to witness that what they say is the truth. That is what a witness does when he takes the oath. Would any court reverse a case because a witness on the stand so emphasized his testimony? Clearly not.

I think that, for the reasons given, and for those stated by Mr. Justice De Graff in his dissent, the evidence was admissible. But even if it were not proper, it was clearly without prejudice, because, among other reasons, Davenport testified to the same thing, as a witness on the stand, and the evidence clearly shows defendant guilty, and no other verdict could properly have been reached.

The rules of evidence are the same in criminal as in civil cases. Code Section 5483. As said in the majority opinion, we will not presume prejudice. The record must not only show error, but also that the complaining party was prejudiced thereby. *McKenna v. Hoy,* 76 Iowa 322; *Fulmer v. Fulmer,* 22 Iowa 230; 4 Corpus Juris 912.

Appellate courts have inherent power to decide that an error was harmless, and to refuse to disturb a judgment because of it, when they believe that a proper judgment has been rendered; and where the unsuccessful party is not entitled to suc-

ceed in any event, he cannot complain of error committed at the trial. *First Nat. Bank v. Fulton,* 156 Iowa 734; *Wetmore v. Mellinger,* 64 Iowa 741; 4 Corpus Juris 909.

A judgment will not be reversed because of the erroneous admission of evidence, where it did not affect the result, or could not have done so, or where the legal evidence abundantly established the case, or where it is apparent that the verdict would or must have been the same, had the evidence not been admitted. *Garrow v. Toxey,* 188 Ala. 572; *Jefferson C. O. & F. Co. v. Pridgen,* (Tex. Civ. App.) 172 S. W. 739; *Whinnery v. Cundiff,* (Iowa) 150 N. W. 659 (not officially reported); *In re Will of Wiltsey,* 122 Iowa 423; 4 Corpus Juris 970, 971.

The admission of improper evidence is without prejudice where not only the fact in question, but the whole of the prevailing party's case, is amply sustained by competent evidence. *Armour & Co. v. Skene,* 153 Fed. 241 (82 C. C. A. 365); *Baker v. Montgomery,* 78 Neb. 98; 4 Corpus Juris 977. Otherwise where it is likely that the jury gave some weight to the erroneously admitted evidence, because the remaining evidence was in sharp conflict, or because the other witnesses were discredited or impeached. *Larson v. Lammers,* 81 Minn. 239; *Brown v. Warner,* 116 Wis. 358; *In re Blair,* 99 App. Div. 81 (91 N. Y. Supp. 378); 4 Corpus Juris 977.

Error in the admission of evidence is nonprejudicial where the complaining party himself adduces evidence to the same effect, or of the same kind. *Miller v. Wagner,* 160 Iowa 445; *Weatherbee v. Byam,* 160 Mich. 600; *Herrick v. Holland,* 83 Vt. 502; 4 Corpus Juris 972, 977.

The admission of evidence of statements by Davenport at the scene of the crime is harmless where, as here, there was competent evidence to the same effect, Davenport having testified, as a witness, to the same thing. *Gulf, T. & W. R. Co. v. Dickey,* (Tex. Civ. App.) 171 S. W. 1097; *State v. Mitchell,* 195 Iowa —.

Perhaps I should point out again that the evidence complained of herein was in rebuttal. Davenport's evidence to the effect that he was not guilty had gone in before.

It is clear that no prejudice attaches to the erroneous admission of evidence where the fact involved has already been established by competent evidence, and the evidence erroneously

received is merely cumulative, or subsidiary and corroborative. *Holmes v. Rivers,* 145 Iowa 702; *Brattebo v. Tjernagel,* 91 Iowa 283; *Payne v. Waterloo, C. F. & N. R. Co.,* 153 Iowa 445; 4 Corpus Juris 977, 978; *State v. Mitchell,* supra.

All the circumstances referred to in the foregoing cases appear in the instant case. We do not understand appellant to claim that the State, in the lower court, in argument or otherwise, claimed anything for the statement of Davenport when the sheriff had the rope around Davenport's neck. Davenport at that time made no statement of any fact against this defendant, unless it be, as stated by the majority, it was so indirectly. But Davenport was defending himself against proceedings which, as I think, were instigated and approved by this defendant, and for his own benefit and advantage. The trial court was in the thick of it, and saw and heard everything that transpired. In overruling the motion for new trial, he was of opinion that there was no prejudice from the matter now complained of, or from anything else that occurred during the trial. We have often said that we ought not to interfere with the discretion of the trial court in refusing a new trial under such circumstances. *State v. Waterbury,* 133 Iowa 135; *State v. Norman,* 135 Iowa 483.

Finally, it is inconceivable to me that a jury should, in a case involving the life of a human being, so far forget the obligation of their oaths, where the evidence is overwhelming, as to give any consideration to this evidence, which, so far as appears, was a mere incident in the trial. I would affirm.

DE GRAFF, J. (dissenting.) I cannot concur in the reversal of the judgment. The points and propositions advanced by appellant, and upon which he predicates a reversal, have to do with certain legal phases of the case involving primarily the admissibility of evidence. The sufficiency of the evidence to sustain the verdict returned is not questioned on this appeal, and with the sufficiency of the evidence in any criminal case an appellate court is necessarily concerned. No trial in a nisi-prius court is perfect, and it is only prejudicial error that should cause an appellate court to reverse the judgment of the trial court. This is the legal effect of our statute. On an appeal

in a criminal case this court must examine the record, and without regard to technical errors or defects which do not affect the substantial rights of the parties, render such judgment on the record as the law demands. Code Section 5462.

The testimony upon which the majority opinion predicates a reversal simply tends to prove an illegal method by the sheriff's office in an attempt to wring from the witness Davenport a confession of the crime charged in the indictment. It constituted a perverted means of injustice to discover the perpetrator of a dastardly crime, but in my judgment and in the light of the entire record it was nonprejudicial to the defendant Williams. The implications by the defendant Williams involving and charging that Davenport committed the crime were first made on August 22d, three days after Williams had been arrested the second time charged with the murder, and it was at this time and for the first time that Williams repudiated his former statements that the watch he had sold to Cohen was "his girl's watch," and his later statement that he had won the watch in a crap game. The statements of Williams implicating Davenport stand uncorroborated either by the testimony of any other witness or by facts and circumstances tending to establish the truth of the claimed admissions of Davenport to the defendant, unless it may be said that the reputed conversations of Williams and Davenport in Williams' cell, as testified by officers connected with the sheriff's office, shall be so accepted.

It is apparent from the record that certain officers connected with the office of the sheriff of Polk County were attached to the belief that Davenport was guilty, and that Williams was innocent of the crime charged. The prosecution was placed in a peculiar situation. This is evidenced by the actions of Deputy Sheriff Lockard, by the statements of Deputy Sheriff Theis to witness Stader, and by the plan or scheme adopted by the sheriff's office in an attempt to fasten the guilt upon Davenport. This court is not necessarily concerned with the reasons assigned or stated by the trial court in admitting the testimony upon which reversible error is based in this court. The question is, does the record and the theory of the case as disclosed by the record make the evidence in question competent and therefore admissible? I adopt the reasoning of Preston, J. in

his dissent, and in addition thereto offer the following and additional reasons that the judgment entered should be affirmed. There is but one proposition involved and but one point in controversy in this court on this appeal.

The State had the burden of proving beyond a reasonable doubt that the defendant Williams committed the crime charged, but by reason of the claimed admissions and statements of Davenport to Williams as testified to by Williams, and having the semblance of support through certain deputy sheriffs, the State also had to disprove that Davenport committed the crime. Davenport was not on trial, and was not under indictment, but according to the testimony of Williams he was in fact the guilty party. If the jury believed the testimony of Williams, it would constitute sufficient proof that Davenport was guilty of the murder of Sara Thorsdale. It appears, as heretofore stated, that by reason of the statements made by Williams a number of persons connected with the sheriff's office became attached to the belief that Williams was innocent and Davenport guilty, and in order to more firmly establish that belief the sheriff's office undertook by means not recognized by law to prove the statements made by Williams.

Upon the rearrest of Williams, and on the third day thereafter, the sheriff's office first learned from Williams the part that Davenport played. Williams for the first time, and in contradiction of his former statements, claimed he secured the wrist watch from Davenport. On that day an information was filed and a warrant issued for the arrest of George Davenport. This information was sworn to by Ray Lockard who was acting as a deputy sheriff. Davenport was arrested and confined in the Polk County jail, but he was not told for what crime he was arrested. On the same evening Sheriff Robb, Lockard, and other deputies brought Williams from his cell to the office of the sheriff in the county jail, and Williams was told that Davenport was under arrest and that it was up to him (Williams) to disprove the statements in reference to the watch and other matters against him and that they were going to give him a chance and intended to put Davenport in the cell with him and that these deputies or others would be listening and that this was his opportunity to show that Davenport killed the girl.

As a part of the same plan or scheme Davenport was also called in and was told that he would be placed in the cell with Williams and that he should find out from Williams about the murder of Miss Thorsdale. Davenport at this time did not know that Williams was acting under instructions, and Davenport consented, as he said, in order to help law and justice. Davenport was placed in Williams' cell and deputy sheriffs and others were placed in cells on each side of the one occupied by Williams and Davenport. Some of the persons who were "listening in" claim that Davenport made some statements which were offered as admissions indicating that he knew something about the death of the girl. About one o'clock in the morning Davenport was taken out of the cell and was told that whisky would be furnished or sent to the cell and that he and Williams were to drink it with the express purpose of finding out if something more could be learned. Davenport was again placed in the cell and shortly thereafter a colored fellow by the name of Sam Greer was sent in with a bottle of whisky which the three men drank. It is quite apparent that the whole purpose of this transaction was an attempt to get some admissions or statements of some kind out of Davenport, since it was Williams who occupied the vantage ground and was taken into the confidence of the sheriff's office. The sheriff's force not satisfied with this plan or the results thereof at a later time and in furtherance of the scheme to implicate Davenport took Davenport one night to the place where the body of Miss Thorsdale had been found and there with the thought of forcing a confession from Davenport made him believe that he was about to be hanged. No confession was secured. The preliminaries to this affair were made realistic with handcuffs, chains and rope. Even a shot was fired by the sheriff with the hope that the negro Davenport with a little of the superstition of his race still in his make-up would tell something connecting him with the crime. No words fell from his lips except a prayer to his God that those who were about to hang him would be forgiven. The trial court permitted these matters to be shown by the State on rebuttal, and after Williams and those who had carried out the original scheme in the attempt to implicate Davenport had testified. All of the matters in the first instance which have reference to the

conversation of Davenport and Williams in the cell were introduced into this record by the defendant, and his friendly witnesses from the sheriff's office.

It is the claim of the State that since the sheriff and his deputies had taken the stand and testified to the conversations in the cell, it was competent for the State to show what other means were used against Davenport in order to fasten this crime upon him and to acquit Williams. It is always competent to show the interest, if any, of a witness in the outcome of a trial. His credibility and the weight to be given his testimony is a jury matter and if the testimony showed that Williams in connection with certain law-enforcing officers were attempting to build up a defense, and to cast a doubt upon the State's testimony proving or tending to prove the guilt of Williams, then it was proper for the State to show the methods that were used not only in the first attempt but in other methods that had the same end in view. Some of the witnesses who testified to his statements in the cell were present and took part later in the attempt to force admissions from Davenport. It was competent to show these transactions as under this record it would tend to prove their feeling and their interest in the case and as bearing upon the truthfulness and credibility of the statements credited to Davenport, but denied by him.

The defendant put into this record certain statements of these witnesses which had to do with the issues in this case, and it was competent for Davenport not only to deny that he had ever made such statements but to show the circumstances and conditions in which he found himself, not only at that time but at another time when some of the same witnesses were present.

The State had the burden of proving the guilt of Williams, and by reason of the claim of Williams, incidentally, to prove the innocence of Davenport. To establish the guilt of Davenport whisky was sent to the cell by the sheriff for the real purpose of getting Davenport drunk. Williams knew and had been told by the sheriff that parties would be present and would listen to what was said between him and Davenport. Davenport did not know this. This was a scheme. The defendant was a party to that scheme. The State had a right to prove all of the circumstances connected with that scheme to show the feeling,

the interest and the methods used. These matters went to the good faith of the witnesses. The jury was entitled to say what weight should be given to the claimed statements, and whether the statements alleged to have been made by Davenport were made and were to be understood in an incriminating sense or as a part of a play presumably to involve Williams, but in fact to fasten guilt on Davenport, who was an actor in this drama, but was not there by voluntary appearance. These matters we repeat are all competent to go to the jury in determining the credibility of the witnesses and the weight to be given their testimony under such circumstances. This record establishes the fact that there was a scheme or plan on the part of certain persons to fasten the crime on Davenport, and to establish the innocence of Williams. Therefore, all matters in connection therewith which are shown to be in the furtherance and the carrying out of such a scheme or plan were competent to be proved by the State. This evidence was provoked by Williams. The State is not required under such circumstances to be content with a bare denial from the party accused by the defendant. The limitations placed on the prosecution depend largely on the circumstances in each particular case, and when a defendant injects such an issue, the State is privileged to meet it. Under this record the evidence offered by the State on rebuttal in my judgment does not constitute reversible error. I would affirm.

ARTHUR, J. (dissenting.) I agree with the majority opinion that the testimony of what took place out in the woods in the way of administering the "third-degree" treatment should not have been received in evidence, but I think that such testimony was not prejudicial to defendant. I have examined the record carefully, and have come to the conclusion that the evidence produced by the State established the guilt of defendant beyond a reasonable doubt. From the record I am abidingly convinced of the guilt of defendant.

I would affirm the judgment of the trial court.